UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JOHN D. KNOX,

                        Plaintiff,

        —against—

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

                        Defendant,
-----------------------------------------------------------x

**MEMORANDUM AND ORDER**

10-CV-38 (SLT)

**TOWNES, United States District Judge:**

       Plaintiff John D. Knox brings this action pursuant to Section 205(g) of the Social

Security Act, as amended, 42 U.S.C. §405(g), seeking review of a final decision of Defendant

Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), which

held that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act

and was, therefore, ineligible for Disability Insurance Benefits.  Plaintiff and the Commissioner

now cross-move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons

set forth below, the Commissioner's motion is denied and plaintiff's cross-motion is granted to

the extent of remanding this action to the Commissioner for further proceedings in accordance

this opinion.

***BACKGROUND***

***Plaintiff's Education and Work History***

       Plaintiff was born on October 3, 1965 (42, 175).[1]  His mother was bipolar (72-73), and

plaintiff spent most, if not all, of his first three years in foster care (362).  Although he was

raised by his mother thereafter, he developed such severe behavioral and emotional problems

---

[1]Numbers in parentheses denote pages in the Administrative Record.

that he had to be psychiatrically hospitalized at age 10 and placed in residential treatment programs during his teenage years (*id*.).

Plaintiff attended a public high school in Brooklyn, but quit school in 1983 after the third day of eleventh grade (45-46). After he turned 18, plaintiff signed himself out of residential treatment (362). Although it is unclear precisely what he did between 1983 and 1988, the record reflects that plaintiff was in the Navy for approximately one and one-half years during this period (51-52).

During his tenure in the Navy, plaintiff developed problems with his feet. According to plaintiff, he had unicameral bone cysts in his right and left heel bones and a necrotic metatarsal in the right foot (52).[2] The cysts were drained and the metatarsal was removed (*id*.). Thereafter, plaintiff was unable to return to his job as a gunner's mate (53). However, it is unclear whether plaintiff was unable to return to the job because of his foot condition or because he "was drinking heavily" (*id*.). Plaintiff received a general discharge from the Navy, but considers himself "lucky" to have "escaped with a bad contact [*sic*] discharge" (*id*.).

By 1986 or 1987, plaintiff was living in Atlanta, working as a security guard (50). One day, while walking outside of "the headquarters," plaintiff was struck by a car (*id*.). At his July 2008 hearing relating to this case, plaintiff recalled, "The front hit me and I kind of rolled off the hood" (*id.*). However, plaintiff did not seek medical treatment following the accident (*id*.) and did not suffer any injuries that were immediately apparent (51).

_____

[2]A unicameral (or simple) bone cyst is a cavity found within a bone that is filled with straw-colored fluid. *See* http://orthoinfo.aaos.org/topic.cfm?topic=A00081. It is a benign (non-cancerous) condition, usually found in patients younger than 20 years of age. *Id*. "Necrosis" refers to the death of living cells or tissues, *see* http://www.medterms.com/script/main/art.asp?articlekey=4514, so plaintiff was describing a condition involving the death of cells in one of the bones – a metatarsal – in his right foot.

In 1988, plaintiff moved to the San Francisco area (46). There, he worked in the receiving department at Burlington Coat Factory for approximately four months before being offered a job as an assistant manager of a Fotomat (47). He worked in that capacity – opening and closing the store, printing photos, and "doing the usual light accounting of the day's receipts" – for about one year before the store closed (*id*.). Plaintiff then got a similar job at "Presto Prints," where he worked as an "assistant manager, . . . photo printer, [and] . . . customer service rep" (48).

After working at that job for six months, plaintiff found a job closer to home at a Kaybee Toys store in a mall (49). There, plaintiff worked as a clerk, "[w]alking the floor [and] . . . helping people find toys" (*id*.). However, after the earthquake that rocked the Bay Area in October 1989, plaintiff "didn't want to work in a mall anymore because of [his] fear of the ceiling coming down on [him]" (*id*.).

Plaintiff next found a job in a liquor store in a suburb of San Francisco, where he largely worked behind the cash register (49-50). Although plaintiff "didn't really do that much stocking," he left the job in January of 1991 because the job required too much standing (50). As plaintiff explained at his July 2008 hearing in this case, "they had . . . an elevated stool behind the counter, and between that and the standing, I really couldn't do the job . . ." (*id*.).

Plaintiff then applied for, and was granted, Social Security benefits under both Title II and Title XVI. According to plaintiff, those benefits were awarded because plaintiff was suffering both from "lower back pain" and "depression" (55). The record does not provide any other information regarding this prior application for benefits.

There is some evidence in the record, however, suggesting that plaintiff had a history of substantial mental health issues. First, plaintiff testified at the July 2008 hearing that he had

been "hospitalized for mental illness . . . , on and off," since he was 9 years old (55). Second, a document prepared by a State Disability Analyst after contacting plaintiff's neurologist/ psychiatrist, Dr. Wael Kamel, states that plaintiff had been admitted to a psychiatric hospital about 30 times prior to 1994 (202).

The only specific information concerning these psychiatric hospitalizations relate to the two most recent admissions, which occurred in the mid-1990's. In 1994 or 1996, plaintiff was admitted to a psychiatric facility for about three months after "cutting" his right arm (70, 202).[3] In 1995 or 1996, plaintiff was admitted to a hospital for unspecified psychiatric problems and alcohol abuse (202).

According to a report issued by a consultative psychologist, plaintiff entered a two-year residential alcohol treatment program in 1996, after being arrested for burglary (363). Since then, plaintiff has abstained from alcohol use (*id.*). Plaintiff also obtained his G.E.D. in 1996 (45).

Plaintiff began working again in 1998, when he started working part-time at a video store (56). It is unclear whether plaintiff's return to the workforce had anything to do with the dissolution of his first marriage, which also occurred in 1998 (58). Initially, plaintiff tried "to keep below the amount that you were allowed to work" without losing his Social Security benefits (56). However, plaintiff "made a little bit too much" (*id.*), and was notified that he would no longer be receiving benefits (59).

---

[3]"Cutting" is not a suicide attempt but a form of self-injury in which the person literally makes small cuts on his or her body, usually the arms and legs. *See* http://www.webmd.com/mental-health/features/cutting-self-harm-signs-treatment.

Plaintiff did not reapply for benefits (58). Rather, in November 1998, after working for the video store for approximately five months, plaintiff moved back to New York (*id.*). He found a job at another video store – West Coast Video in Forest Hills, New York – where he worked as a "customer service rep" (60-61). He remained in that position until May 1999, when he was hired by Nydex in Manhattan (61). As an employee of Nydex, plaintiff worked for other entities which had contracted with Nydex to supply labor (*id.*), functioning "predominantly [as] an assistant office manager, . . . purchasing office supplies and replacing toner cartridges on copiers and doing inventory of supplies and processing employee orders for supplies" (62). In October 2000, one of these entities – Inviva, Inc. – hired plaintiff to be an office manager (62-63). Plaintiff, who testified that the job was both "fun" and "profitable," remained in the position for about three years (63).

On July 24, 2003, plaintiff – who had re-married at some point following his return to New York – became a father (42, 63). His wife held a well-paying job as an auditor for the New York State Tax Board, while plaintiff's salary did not even cover the costs of childcare (*id.*). Accordingly, in October 2003, plaintiff left his job at Inviva to become his son's primary caretaker (*id.*). He returned to West Coast Video, where he worked part-time in the evening after his wife came home (64). In 2005, plaintiff went to work for Safeguard Self Storage, a storage facility located in New Hyde Park, New York (64, 223). There, plaintiff's duties included renting out storage spaces, cash management, light accounting and "inspection of the facility on a regular basis" (64).

***Plaintiff's Current Health Problems***

Shortly after he left his job at Inviva, plaintiff began to experience myriad health problems. On January 20, 2004, plaintiff visited the offices of Dr. Neil G. Blatt, a podiatrist,

complaining that he had been experiencing foot pain for two days (228-29, 236). In a form plaintiff completed prior to the examination, plaintiff stated that he had pain in his right foot which ranged "from dull throbs that radiate on left side to sharp twinges on right," as well as heel and arch pain (236). On examination, however, plaintiff apparently complained primarily of heel pain in both feet, stating that the left was more painful than the right (229).

Dr. Blatt took X-rays, which revealed heel spurs on both feet (*id.*). The doctor diagnosed plaintiff with heel spur syndrome (229, 234). Although Dr. Blatt's charts are not entirely legible, a medical report completed by Dr. Blatt in August 2004 indicates that plaintiff was treated with injections (234).

Plaintiff continued to be in pain a week after his initial visit (232). He agreed to try orthotics and casts were taken of his feet (*id.*). However, on his third visit to Dr. Blatt, on February 10, 2004, plaintiff reported a "70% improvement overall" (*id.*). By February 24, 2004, when the doctor dispensed the orthotics, plaintiff was "[d]oing very well" (*id.*).

On July 6, 2004, however, plaintiff returned to Dr. Blatt's office complaining of left heel pain of a few days duration (231). Plaintiff received additional injections, but continued to complain of heel pain a week later (*id.*). Accordingly, the doctor decided that plaintiff was a candidate for orthotripsy – a form of shock wave therapy (231, 234). Although plaintiff had two such treatments – on August 9 and 16, 2004 (231) – there are no records of any subsequent visits included in the Administrative Record.

Indeed, the most recent document pertaining to Dr. Blatt which is contained in the Administrative Record is a "Medical Report" dated August 16, 2004 (233-34). That report indicated that plaintiff had been complaining of severe left heel pain upon ambulation and immediately after rest, and that X-rays had revealed bone spurs on the bottom the heel bone

(233). In addition, the examination revealed that plaintiff had pain when certain parts of the foot were palpitated, and plaintiff's complaints were consistent with plantar fasciitis (*id*.).[4]

Dr. Blatt diagnosed plaintiff with intractable and chronic heel spur syndrome, and opined that plaintiff's prognosis would be "guarded" with treatment, and "poor" without it (234). The doctor further opined that plaintiff should avoid lifting and carrying things and "excessive walking" (*id*.). The "Medical Report" did not specify what amount of walking would be "excessive," or discuss plaintiff's ability to stand.

On June 9, 2004, plaintiff began visiting Dr. Marissa T. Santos, an internist practicing in Rego Park, New York. At the time of his initial visit, plaintiff had not had a physical exam in two years (305). However, he reported that he had received steroid injections in his lower back in the past and was taking some sort of medication for back pain (*id*.). There was no indication who, if anyone, had prescribed that medication or that plaintiff was then taking any medication for high blood pressure, which measured 152/110 (306).

On the day of his initial visit, plaintiff complained of a sore throat, a fever, and a "cough with blood streaks" (360). Accordingly, Dr. Santos sent plaintiff for chest X-ray, which revealed the presence of a fluid in plaintiff's lungs (*id*.). Dr. Santos was uncertain regarding the cause of the hemoptysis,[5] but diagnosed plaintiff with hypertension and placed him on Cozaar, a high blood pressure medication (306).

---

[4]Plantar fasciitis, one of the most common causes of heel pain, involves inflammation of a thick band of tissue – the plantar fascia – that runs across the bottom of the foot and connects the heel bone to the toes. *See* http://www.mayoclinic.com/health/plantar-fasciitis/DS00508.

[5]Hemoptysis is "spitting up blood or blood-tinged sputum from the respiratory tract." *See* http://www.medterms.com/script/main/art.asp?articlekey=3700.

After a follow-up appointment on June 15 or 18, 2004 – the chart entries regarding which are largely illegible (308) – plaintiff did not see Santos again until October 22, 2004. The chart entries for that date indicate that plaintiff was not taking his medication, had blood pressure of 158/120, and had been in the hospital on October 14, 2004, with a transient ischemic attack ("TIA" or "mini-stroke") (309). The chart did not provide any details relating to this TIA, other than to indicate that plaintiff had been in an emergency room (*id.*). The Administrative Record, however, contains no records relating to this hospital visit other than a single radiology report which reflects that plaintiff had a normal CT scan of the brain at Elmhurst Hospital Center on October 14, 2004 (359).

According to plaintiff, this was not the only TIA he suffered. Plaintiff testified at the June 16, 2006, hearing that he had "had two TIA's in 2005," both of which affected the right side of his body in some unspecified way (68). The first was treated at Elmhurst Hospital, and the second was treated at Forest Hills Long Island Jewish Hospital (*id.*). It is unclear whether the first of these two TIA's was the one discussed above. However, the Administrative Record contains no documents relating to the second.

In light of the October 14, 2004, TIA, Dr. Santos ordered an echochardiogram and doppler examinations of plaintiff's heart and carotid arteries. These test were performed on November 3, 2004. The echocardiogram was normal (354). The spectral doppler, which visualized blood flow through the heart, revealed only "trace mitral regurgitation" (*id.*) and the doppler of the carotid arteries revealed no evidence of "significant stenosis," or narrowing (355). For reasons which are unclear, Dr. Santos also ordered an ultrasound examination of both kidneys, which proved normal (356).

Aside from a visit in January 2005 – at which plaintiff complained of a cough and may have been diagnosed with bronchitis (316), plaintiff did not visit Dr. Santos again until October 2005.  In the one-month period between October 7 and November 9, 2005, however, plaintiff saw Dr. Santos on four occasions, complaining of pains in his back, right hip and right knee (310-14).  Although Dr. Santos's chart entries relating to these visits are largely illegible, there is evidence that she ordered several X-rays during the first of these visits.  On or before October 11, 2005, plaintiff had X-rays of his right hip and lower spine.  The X-ray of the hip was "negative," but the other X-ray showed "mild disc space narrowing at L3-4" and a "large osteophyte formation involving . . . L4" (237, 353).   The X-ray also revealed a possible kidney stone, measuring about one centimeter (*id*.).

Dr. Santos referred plaintiff to Dr. Wael Kamel – an Assistant Clinical Professor at the Albert Einstein College of Medicine who practiced at Appelbaum, Farkash & Waldman, L.L.P., for a neurological evaluation (408).  At the initial evaluation on October 13, 2005, plaintiff complained to Dr. Kamel of chronic low back pain and reported having three prior epidural injections (301, 408).  Plaintiff was already taking Vicodin – a narcotic pain reliever – but without results (301).  Dr. Kamel ordered an MRI of the lumbar spine and prescribed a more powerful form of Vicodin – Vicodin HP (301, 408).

Plaintiff had the MRI on or before October 25, 2005.  This MRI revealed disc desiccation, or drying, at the L3-4, L4-5, and L5-S1 levels, but without significant bulging of the discs at the first two levels (257).  There was "mild" bulging of the disc at L5-S1, but there appeared to be no "contact of the thecal sac [or] exiting nerve root involvement" (*id*.).

On November 1, 2005, Dr. Kamel reviewed the MRI with plaintiff (300).  Although Dr. Kamel's chart entries are unclear, Dr. Kamel's plan appears to have included "PT" or physical

therapy (*id.*).  However, there is nothing in the Administrative Record to indicate that plaintiff went to physical therapy.

On November 29, 2005, Dr. Wael referred plaintiff for a neurosurgical consultation (299).  At that consultation, which took place on December 6, 2005, plaintiff agreed to have Dr. Mitchell E. Levine, perform a microsurgical diskectomy on the disk at the L5-SI level (255).  On January 13, 2006 – three days after obtaining medical clearance from Dr. Santos (347) – plaintiff underwent this procedure.

During the surgery, Dr. Levine discovered a "focal disc herniation at the L5-S1 disc space that was at the level of the disc space and extending up into the body of L5" (253).[6] Indeed, the material within the disc had "all herniated out of the space posteriorly and up onto the body of L5" (*id.*).  This disc material was removed and Dr. Levine performed a facetectomy foraminotomy to "allow unroofing of the nerve root completely" (*id.*).[7]  At the end of the procedure, Dr. Levine was confident that "there was no pressure on the nerve root at all" (*id.*).

Initially, the surgery was a success.  On January 24, 2006, plaintiff told Dr. Levine that he was "doing beautifully" and had "no pain of any significance" (262).  However, on March 21,

---

[6]A herniation is defined as a localized displacement of disc material beyond the limits of the intervertebral disc space. Localized displacement in the axial (horizontal) plane can be "focal," signifying less than 25% of the disc circumference, or "broad-based," meaning between 25 and 50% of the disc circumference.  *See* http://www.asnr. org/spine_nomenclature/recommendations.shtml.

[7]Nerves leave the spinal canal through openings which are called neural foramen. The roof of the neural foramen is composed of "facet joints" from the vertebral body above and below.  If the neural foramen becomes crowded with disc material, bone spurs or thickened ligament, a surgeon may perform a foraminotomy to remove this offending material.  If this proves insufficient, the whole facet joint may need to be removed in a procedure called a facetectomy.  *See* http://www.spinehealth.com/facetectomy.php.  Although the surgical report filed by Dr. Levine expressly states that he performed a foraminotomy and facetectomy, Dr. Levine's subsequent records refer to his having performed a "laminectomy," a surgical procedure in which the surgeon removes a portion of the bony arch, or lamina, on the dorsal surface of a vertebra.  *See* http://www.surgeryencyclopedia.com/Fi-La/Laminectomy.html.

2006, plaintiff reported a "significant amount of back pain" (263). Dr. Levine ordered an MRI (*id*.), which was performed on March 27, 2006 (258). A radiologist interpreted this MRI as showing disc dessication at the L3-4 through L5-S1 levels, the post-operative changes, and a "L5-S1 right sided" herniated nucleus pulposus, or slipped disk (258).

Dr. Levine reviewed this MRI at a follow-up appointment on March 28, 2006. Dr. Levine's "Office Note" for that date did not discuss the radiological findings, other than to note that the MRI did not "show any significant compression or lesions" (254). The doctor arranged for a physical therapy program and indicated that he would see plaintiff again in six weeks (*id*). However, there is no indication in the Administrative Record that plaintiff ever saw Dr. Levine again.

On April 24, 2006, plaintiff began physical therapy at Allcare Physical Therapy Associates. In the Patient Health Questionnaire which he complete on that date, plaintiff reported that he was suffering back pain at least half the time, and estimated the intensity of the pain as 2 out of 10 at rest and between 4 and 7 out of 10 with movement (276). On examination, he reported some sort of pain upon bending his torso in any direction (275). He also exhibited a limited range of motion, ranging from 0 to 55 degrees, depending on the direction (*id*.). In addition, plaintiff stated that he could tolerate sitting for 5 minutes, standing still for 15 minutes, and walking 2 to 3 blocks (*id*.).

Plaintiff attended physical therapy once or twice a week until May 18, 2006 (274). At the hearing in this case, however, plaintiff testified that he went to therapy for "about 10 weeks" before quitting because his "insurance couldn't cover it any more" (68). Accordingly, it is unclear whether plaintiff continued with the therapy after May 18, 2006, or whether the charts contained in the Administrative Record are simply incomplete.

Although Dr. Kamel's chart for July 18, 2006, is largely illegible, it reflects that Dr. Kamel ordered a MRI of plaintiff's cervical spine on that date (297). That MRI was performed on August 1, 2006, and revealed abnormalities at C4-5, C5-6 and C6-7 (295). At both C4-5 and C5-6, there was diffuse bulging of the posterior portion of disc, which protruded 2 millimeters "without involvement of the spinal cord" (*id*.). In addition, there were bone spurs and arthritis in the facet joints at both levels, causing"[m]ild encroachment" of the neural foramina at C4-5 and "foraminal stenosis" – or narrowing of the foramina – at C5-6 (*id*.). At C6-7, the bulging was 3-4 millimeters – albeit still without involvement of the spinal cord – and there were osteophytic ridges and spurs which "encroach[ed] on exiting foramina bilaterally" (*id*.).

Based on this MRI, Dr. Kamel made a provisional diagnosis of cervical radiculopathy (343). However, on August 17, 2006, Dr. Kamel performed Needle Electromyography ("EMG") and Nerve Conduction Velocity studies of plaintiff's upper extremities which failed to reveal any evidence of neuropathic or myopathic abnormalities (344). While Dr. Kamel noted "[p]rolonged sensory latency . . . in the left radial nerve," he concluded that this abnormality was "most likely technical" and that there was, therefore, "[n]o electrophysiologic evidence of significant radiculopathy" (*id*.).

### *Plaintiff's Claim and Subsequent Medical History*

In late August 2006, plaintiff applied for Disability Insurance Benefits, alleging that he had become unable to work as of January 9, 2006, due to "spurs, herniated discs, degenerative bone disease, sciatica, stroke" (177). Plaintiff provided the interviewer with the names of five doctors: Drs. Blatt, Kamel, Levine, Santos and a Dr. Hertzel Sure (179-80). According to plaintiff, he saw Dr. Sure between September 2005 and January 2006 "due to strokes," and was referred for tests and prescribed medications by this doctor (180). However, plaintiff did not

provide any further details regarding the tests and prescriptions, and the Administrative Record contains no documents relating to Dr. Sure.

On September 11, 2006, plaintiff completed a "Function Report," in which he described his limitations. He stated that he could "only stand/sit/walk or lie in one position for so long (5-15 mins)" before having to change positions (194). Plaintiff also stated that he could only lift "light items" (*id*.) and could only walk 5 to 15 minutes before having to stop and rest, and that he might have to rest "a few minutes to up to ½ hr." for the pain to subside enough to permit him to continue (195). Nonetheless, plaintiff was able to attend college 2 to 3 times per week (194).

The State Disability Analyst assigned to plaintiff's case arranged for plaintiff to undergo two consultative examinations on January 5, 2007, at Industrial Medical Associates, P.C., in Queens, New York. One was a psychiatric examination conducted by Alan Dubro, Ph.D., a licensed psychologist. Dr. Dubro's findings were "consistent with psychiatric problems," but Dr. Dubro concluded that these were not "significant enough to interfere with [plaintiff's] ability to function on a daily basis" (364-65).

The second was an orthopedic examination performed by Steven Calvino, M.D. According to Dr. Calvino's report, plaintiff said he was experiencing a constant, sharp neck pain which, although it waxed and waned, was "currently rated a 9 on a 10 point scale" (370). Plaintiff also reported a history of chronic back pain (*id*.). However, Dr. Calvino reported that, upon examination, plaintiff "appeared to be in no acute distress," had "full flexion" throughout his spine, and a full range of motion in all extremities (371-72). Accordingly, although he diagnosed plaintiff as having "[c]hronic low back and neck pain" and noted that plaintiff was taking both three daily 50 milligrams doses of Lyrica – a drug used to treat nerve pain – and Vicodin four times a day as needed, Dr. Calvino opined that plaintiff had "no restrictions" (*id*.).

Although the Disability Analyst obtained records from Drs. Levine and Santos (143, 148), it is unclear whether the Analyst had records from Dr. Kamel. A letter from plaintiff's counsel dated October 18, 2006, indicates that Dr. Kamel's records for the period until September 7, 2006, were sent to the State Division of Disability Determination (287). However, in denying plaintiff's claims on February 8, 2007, the Disability Analyst did not list Dr. Kamel's records as being among the documents in the State agency's possession (143, 148). The Disability Analyst also did not list Dr. Blatt's records as being among the documents considered, but stated that the agency had a report from Dr. Kamel dated October 25, 2006, and a report from Dr. Blatt dated August 24, 2006 (*id*.). Neither of these reports is included in the Administrative Record. While the Administrative Record does contain a document signed by Dr. Kamel on January 11, 2007, this is a letter addressed to "To Whom It May Concern," not something that could be characterized as a "report" (374). Indeed, the document contains only two conclusory sentences stating only that plaintiff is Dr. Kamel's patient; that, in Dr. Kamel's opinion, plaintiff "is partially disabled without consideration of any past or present drug and/or alcohol use" and that "[d]rug and/or alcohol use is not a material cause of [the] . . . disability" (*id*.).

Based in large part on reports submitted by Dr. Dubro and Calvino, the Disability Analyst concluded that plaintiff was not disabled. The Disability Analyst concluded:

> [B]ased on your age of 41 years, education of 12 years, and your experience, you can perform a job which would involve less stress than your past work and light work (for example, you could lift a maximum of 20 lbs., with frequent lifting or carrying of objects weighing up to 10 lbs., or walk or stand for much of the working day).

(143, 148).

*Proceedings before the Administrative Law Judge*

Plaintiff, through counsel, then requested a hearing before an Administrative Law Judge (151). By letter dated June 6, 2008, Administrative Law Judge Marilyn P. Hoppenfeld (hereafter, "the ALJ"), notified plaintiff that the hearing would be held on July 16, 2008 (156). On that same date, the ALJ sent letters to Dr. John Axline, a medical expert, and Julie A. Andrews, a vocational expert, requesting that they appear and give testimony at the hearing (168-171).

Although the ALJ's letter alerted the experts that they would be testifying about the period "January 9, 2006 through the present" (168, 170), there is nothing in the Administrative Record to suggest that the ALJ provided these experts with any information more recent than December 5, 2006. While the Administrative Record contains records from Dr. Santos, it contains only those records collected by the Disability Analyst in December 2006, the most recent of which dates from December 5, 2006. Similarly, the Administrative Record contains only those records from Dr. Kamel which plaintiff's counsel sent to the Division of Disability Determinations on October 18, 2006 – the most recent of which dates from September 7, 2006. Updated Disability Reports which plaintiff completed in connection with his appeal, however, indicated that plaintiff had seen both of these doctors in 2007 and was continuing to see them (208, 222).

At the hearing on July 16, 2008, plaintiff's counsel produced two sets of documents, which contained the only post-2006 information regarding plaintiff's condition. The first set of documents related to plaintiff's mental health, and consisted of (1) an undated Psychological Report authored by Irina Ryvkin, a Staff Psychologist at Western Queens Consultation Center (399), and (2) a "Psychiatric/Psychological Impairment Questionnaire" dated June 27, 2008, and

bearing an illegible signature, under which was written "James Bernard, M.D." (400-07). The latter indicated that the author had been seeing plaintiff on a regular basis for over 9 months, beginning on September 12, 2007 (400). Moreover, it stated that plaintiff had been diagnosed with, among other things, a Bipolar II Disorder and Dysthymic Disorder,[8] and would be incapable of even "low stress" jobs (400, 406).

The second set of documents were from Dr. Kamel and consisted of (1) a letter dated July 7, 2008 (408); (2) a "Lumbar Spine Impairment Questionnaire," one or more pages of which – including the signature page – were missing (409-414); and (3) several pages of medical records (415-423). All of the medical records were among those which plaintiff's counsel had sent to the Division of Disability Determinations on October 18, 2006, and have been discussed above. Accordingly, this Court need only describe the other two documents.

The July 7, 2008, letter stated that Dr. Kamel was seeing plaintiff "almost on a monthly basis" for "failed back syndrome, neck pain, headaches, possible TIA/stroke and depression" (408). Dr. Kamel stated that plaintiff was "[c]urrently . . . on [L]yrica, Duragesic patch, and Lexapro," but nonetheless had only "modest pain control" (*id.*).[9] Dr. Kamel opined that plaintiff required "around-the-clock medication and frequent period of rests [*sic*]," and characterized him as "permanently partially disabled" (*id.*).

---

[8]Bipolar II Disorder is a type of manic-depressive illness and is defined by a pattern of depressive episodes shifting back and forth with hypomanic episodes, but no full-blown manic or mixed episodes. In contrast, Bipolar I Disorder is mainly defined by manic or mixed episodes that last at least seven days, or by manic symptoms that are so severe that the person needs immediate hospital care. *See* http://www.nimh.nih.gov/health/publications/bipolar-disorder/complete-index.shtml. Dysthymia is a mild, but chronic, form of depression, in which symptoms usually last for at least two years, and often for much longer. *See* http://www.mayoclinic.com/health/dysthymia/ DS01111.

[9]The Duragesic Patch "should be used only for long-term or chronic pain requiring continuous, around-the-clock narcotic pain relief that is not helped by other less powerful pain medicines or less frequent dosing." Http://www.drugs.com/cdi/duragesic-patch.html#00ECX7QTlcMkzwMc.99.

The "Lumbar Spine Impairment Questionnaire" provided an assessment of plaintiff's limitations. It stated that plaintiff could sit for only three hours, and stand for only three hours, during an eight-hour day (411); could only occasionally lift and carry objects weighing up to 10 pounds; and could not lift or carry heavier objects at all (412). It further stated that plaintiff had "chronic moderate-severe pain" in his lower back, radiating into his legs, which medication did not completely alleviate and which was severe enough to frequently interfere with attention and concentration (411, 413). In addition, the questionnaire stated that plaintiff would have to take 30-minute breaks for every 30 minutes to one hour spent working, would be absent more than three times a month due to the impairments or treatments, and would be unable to perform tasks that required keeping his neck in a constant position, such as looking at a computer screen or looking down at a desk (414). The questionnaire concluded that, in light of these physical limitations and plaintiff's depression, plaintiff could not "do a full time competitive job that requires activity on a sustained basis" (414).

At the July 16, 2008, hearing, the ALJ questioned plaintiff at length. Plaintiff confirmed that he had been undergoing treatment at the Western Queens Consultation Group since September 2007 (71), but testified that he was not bipolar (73). However, he was taking a daily dose of 100 milligrams of Zoloft – an anti-depressant – and had been taking Lexapro before that (96). Plaintiff also testified that he had been hospitalized earlier in 2008 for kidney stones (66).

With respect to physical limitations, plaintiff testified that he could bend "with difficulty" and could only pick things up from the floor if he got down on his knees (83). At the hearing, plaintiff estimated that he could stand for only three or four minutes before having to sit or prop himself against a wall (81), and that sitting would become unbearable after 5 to 7 minutes (83). Plaintiff testified that the back surgery had improved his sciatica, but that he was

still experiencing "moderate" symptoms (93). He was also experiencing pain in his left foot (91), and back pain so severe that four 10 milligram doses of Vicodin a day "wasn't doing the job" (94). Indeed, plaintiff testified that, four months prior to the hearing, his prescription had been charged to substitute a Fentanyl patch for the Vicodin (*id*.).

Plaintiff could take public transportation, but claimed that he could only walk two or three blocks at a time (76). He testified that he "took the train" to the hearing, but that he had "some pain in [his] left foot from walking to the train station and walking from the train station" to the hearing – a total of four or five blocks (91-92). Plaintiff also took the subway from his home in Woodside, Queens, to Hunter College four days a week during the school year, but sat on the floor during classes because the chairs were "horrible" (73-75). He was maintaining a 3.5 GPA, but was only taking 9 or 10 credits a semester because 13 was "too much" (74).

The ALJ also took testimony – albeit telephonically – from the two experts she had asked to appear: Dr. Axline and Ms. Andrews. When plaintiff's counsel asked for their CV's, noting that they did not appear in the file, the ALJ said she did not have them and would have to "mail them" to plaintiff's counsel (36). However, the ALJ assured counsel that she would "do a quick voir dire" (*id*.).

At the start of Dr. Axline's testimony, the ALJ established that he was a board certified orthopedist, who had graduated from Ohio State University and obtained his "license" in 1956 (97). The ALJ herself then added that Dr. Axline was a surgeon, and asked plaintiff's counsel if he wanted "any other information on a voir dire" (97). When counsel responded, "no," the ALJ asked the doctor to send a copy of his resume to her attention so that she could "make sure it gets into the folder" (98). No resumes appear in the Administrative Record.

Dr. Axline's began his testimony by summarizing the medical records before him. First, he discussed the treatment which plaintiff had received for his heel in 2004, asserting that the X-ray showing bone spurs was "basically . . . normal" and evidence of only "minor symptomatology" (103). He then discussed plaintiff's lower back surgery, noting that plaintiff was doing "quite well" and was "very happy with the results" two weeks after surgery (104). He did not mention plaintiff's subsequent reports of pain.

Dr. Axline then questioned the neurological findings of Dr. Kamel, the board certified neurologist. Dr. Axline described the cervical MRI and noted that, although there were bone spurs in the foraminal spaces (105), an "EMG" had proved negative (106). He then opined that there was no radiculopathy, and faulted Dr. Kamel for saying plaintiff "had cervical radiculopathy despite the fact he was aware that three months before the EMG had been normal" (106).

Dr. Axline – who had never examined or even seen plaintiff – then opined that plaintiff could walk for two-hours and sit for six hours in an eight-hour day, if he "had the opportunity to change positions" (110). In connection with the former assessment, the doctor stated that plaintiff, despite claiming that he could only walk two or three blocks, testified that he had walked five blocks in order to get to the hearing (109). The latter assessment was based on the fact that plaintiff had traveled from California to New York and the doctor's assumption that "whatever type of transportation involves sitting for more than five minutes" (110). The doctor further opined that plaintiff could lift 10 pounds occasionally and was capable of performing at least sedentary work (111).

When questioning the vocational expert, Ms. Andrews, the ALJ's "quick voir dire" consisted of a single question: "Are you on the panel of vocational experts maintained by the

Office of Disability, Adjudication and Review?" (126). When Ms. Andrews answered in the affirmative, the ALJ stated: "Counsel, she's testified before me. I find her qualified, but we'll send you copies of her PQ, okay?" (*id.*).

The vocational expert then reviewed plaintiff's work history, noting that the jobs ranged from medium exertion to sedentary (128). Accordingly, when asked to assume that plaintiff could perform sedentary work, the expert opined that plaintiff could still work two of his prior jobs: office manager or order clerk (129). However, since these positions were skilled and semi-skilled, respectively (127), the ALJ inquired whether plaintiff could do any of his past work if he were "reduced to simple, repetitive, no decision, simple, repetitive, routine jobs with limited decision-making, routine decision-making" (129). Ms. Andrews noted that all of plaintiff's past work that fit these criteria would be "light exertion" (*id.*), but noted that there were other jobs fitting those criteria that were sedentary, including "surveillance system monitor," "preparer," and "label pinker," which were available regionally (130-31).

After the hearing, the ALJ sent Dr. Axline the exhibits which plaintiff's counsel had brought to the hearing. On July 17, 2008, the ALJ sent a letter addressed to Dr. Axline in Fairfield, Connecticut, but bearing the salutation, "Dear Charles E. Binder" (26). This letter began, "I have secured additional evidence that I propose to enter into the record. I am enclosing that evidence . . . for your review" (26). The letter then referenced the two sets of documents which plaintiff's counsel had produced at the hearing (*id.*). The letter then listed actions the addressee could take, including submitting "written questions to be sent to the author(s) of the enclosed report(s)," requesting a supplemental hearing and requesting that witnesses be subpoenaed to appear at that hearing (*id.*). The letter concluded by noting that the ALJ would

assume that the addressee did not wish to submit any written questions or request a supplemental hearing unless she received a response within 10 days (27).

The Administrative Record does not indicate to whom the letter was mailed, or that plaintiff's counsel ever received it or sent any response. Indeed, the only response was from Dr. Axline. In a one-page letter dated July 30, 2008, Dr. Axline stated that he had received the additional exhibits on July 24, 2008, and had reviewed them and the notes which he had prepared for the hearing (225). Without further elaboration, Dr. Axline stated, "The medical content of the new exhibit does not contain any information that would cause me to change any answer I gave at that hearing" (*id*.).

### The ALJ's Decision

On December 5, 2008, the ALJ issued her decision, concluding that plaintiff was not disabled under Sections 216(i) and 223(d) of the Social Security Act (25). The ALJ began her opinion by outlining the "five-step sequential evaluation process" dictated by 20 C.F.R. §404.1520(a), which is used to determine whether a claimant is disabled. Under this five-step framework, the Social Security Administration ("SSA") must first consider the claimant's work activity. If the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings (20 C.F.R. §§404.1520(a)(4)(i), 404.1520(b)). Otherwise, the SSA next considers the "medical severity" of the claimant's impairment (20 C.F.R. §404.1520(a)(4)(ii)). If the claimant does not have "any impairment or combination of impairments which significantly limit [his or her] physical or mental ability to do basic work activities," the claimant does not have a severe impairment and, therefore, is not disabled (20 C.F.R. §404.1520(c)).

In the third step, the SSA further considers the medical severity of the impairment by comparing the claimant's impairments to those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant has an impairment or combination of impairments which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is disabled (20 C.F.R. §404.1520(d)). If not, the SSA must proceed to the fourth step and assess the claimant's "residual functional capacity" to do his or her "past relevant work" (20 C.F.R. §404.1520(a)(4)(iv)). If the claimant can still do his or her "past relevant work," the claimant is not disabled (*id*.). However, even if the claimant can no longer perform the past relevant work, the claimant is not disabled if he or she "can make an adjustment to other work" (20 C.F.R. §404.1520(a)(4)(v)). The Social Security Administration bears the burden of proof only with respect to this fifth step. The claimant bears the burden with respect to the other four steps. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

The ALJ then recounted plaintiff's testimony. Although the summary was detailed, portions bespeak a lack of familiarity with the record. For example, the ALJ stated:

> In 1996, he [plaintiff] was in a program for three months regarding his alcoholism. His neurologist and psychiatrist recommended he go to Western Queens Group for his alcoholism. The last time he attended was in September 2007 (14).

In fact, plaintiff had testified that he was in a mental hospital for three months in 1996 (70), and that he *first* went to Western Queens Consultation Group in September 2007 after Dr. Kamel, his "neurologist, who is also a psychiatrist, recommended [he] go there because [he] was feeling worthless," and was still undergoing treatment (71). Plaintiff implicitly denied any recent alcohol use, testifying that he had been "in recovery" for 12 years as of the time of the hearing and had not relapsed (89-90).

Similarly, the ALJ's summary of plaintiff's testimony concerning his medical history was inconsistent with the actual testimony. The ALJ implied that plaintiff "started to have mental symptoms" while in college (14), though plaintiff testified that he had been "hospitalized for mental illness . . ., on and off, since [age] . . . 9 (55). The ALJ stated that plaintiff "said he had a TIA . . . on the right side and was in Forest Hills Long Island Jewish Hospital" and that "[i]n 2000, he was in the hospital for one day to pass a kidney stone" (14). In fact, plaintiff testified that he had two TIA's – the first of which was treated at Elmhurst Hospital (68) – and was hospitalized for kidney stones in 2008 (66).

With respect to medications, the ALJ stated that plaintiff "related that he . . . had . . . also been prescribed Ritalin, Stalzine, Prozac and Zoloft for his Bipolar condition," and "uses a Fentagyle [*sic*] Patch [and] took vicodin for four months" (15). In fact, while there was evidence that plaintiff had been diagnosed with Bipolar II Disorder, plaintiff expressly denied it (73). In addition, plaintiff testified that he had quit using Vicodin four months prior to the hearing because it was not working and switched to a Fentanyl patch (94).

In discussing the medical evidence, the ALJ made no mention whatsoever of the "Lumbar Spine Impairment Questionnaire," which indicated that plaintiff was unable to sit or stand/walk for more than three hours during an eight-hour day, unable to lift or carry objects weighing more than 10 pounds, and only occasionally able to lift and carry objects weighing less than 10 pounds. The ALJ did state that "[o]n January 11, 2007, Dr. Kamel advised that [plaintiff] was a patient of his and opined claimant was disabled" (21). However, the ALJ neither mentioned Dr. Kamel's more detailed letter dated July 7, 2008, nor provided any reason for disregarding the portion of that letter which stated that plaintiff was "permanently partially disabled secondary to chronic neck and low back pain" (408).

In contrast, the ALJ discussed at length the "Psychiatric/Psychological Impairment Questionnaire" which plaintiff's counsel had submitted on July 16, 2008 – the day of the hearing. Although that report indicated that it had been signed by a Dr. Bernard (407), the ALJ noted that the signature was "illegible" and "appears to resemble [that of] Irina Ryykin [*sic*] APRN MA" (22). Assuming that this report was "submitted by Irina Ryykin [*sic*], not a psychiatrist nor a psychologist, but the staff psychotherapist," the ALJ elected to give this report "little if any weight," opining:

> This report . . . was contradicted by claimant's activities; his intellectual capacity; his passing with good grades in college; performing household duties and care for his child. There was no evidence of any lack of concentration in this record, nor based upon observations made at the hearing (*id*.).

The ALJ concluded that plaintiff had not engaged in substantial gainful activity since January 9, 2006, and had severe impairments, which she listed as "Status post Laminectomy [1/13/2006], with residual fibrocartilage degenerative changes; hypertension, obesity" (17). However, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled one the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, and that plaintiff had the residual functional capacity to perform sedentary work (18-19). With respect to the latter finding, the ALJ echoed Dr. Axline, stating, "He is capable of sitting for six hours in an eight hour day, standing and walking for two hours in an eight hour day and lifting ten pounds occasionally" (19). Finally, the ALJ concluded that, because plaintiff was capable of performing sedentary work, he was capable of performing his past relevant work as an order clerk or office manager (23).

By letter dated January 22, 2009, plaintiff's counsel requested that the Appeals Council review the ALJ's decision (7). However, on November 23, 2009, that request for review was

denied, making the ALJ's decision the final decision of the Commissioner (1). On January 6, 2010, plaintiff, through counsel, commenced this action, seeking review of this decision pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §405(g). Plaintiff's complaint alleges that the decision was erroneous and unfounded, not supported by substantial evidence, and contrary to law (Complaint at ¶¶12-13). The complaint requests that this Court modify the decision to grant the Social Security Disability Benefits during the period of disability (*id*. at 3).

Plaintiff and Defendant now cross-move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Plaintiff argues, *inter alia*, that the ALJ failed to follow the "treating physician rule" and to develop the record. In addition, plaintiff argues that the ALJ violated plaintiff's due process right by failing to proffer the post-hearing evidence from Dr. Axline and failed to properly assess the impact of plaintiff's obesity. Defendant, in contrast, argues that the ALJ decision was correct in all relevant respects. To the extent that they are relevant to the resolution of this matter, the parties' arguments are addressed in the discussion below.

## DISCUSSION

### Standard of Review

Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §405(g), permits "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . [to] obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . in the district court of the United States for the judicial district in which the plaintiff resides . . . ." Upon this review, this district court has the "power to enter, upon the pleadings and transcript of

the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A court's review under 42 U.S.C. §405(g) of a final decision by the Commissioner is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009);  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). "Substantial evidence" connotes "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn."  *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).  The "substantial evidence" test applies only to the Commissioner's factual determinations; similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)

Upon review, this district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability

determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

However, where application of the correct legal principles to the record could lead only to the

same conclusion reached by the Commissioner, there is no need to remand for agency

reconsideration. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

### The Required Procedure

In deciding whether a claimant is disabled, the Commissioner is required by the Social

Security regulations to use the five-step process set forth in 20 C.F.R. §404.1520(a). *See* pp. 21-

22, *ante*. However, the Social Security regulations also dictate what evidence the

Commissioner must consider, and the manner in which the Commissioner must evaluate the

evidence. First, the regulations require that, under some circumstances, deference be given to

the opinions of those physicians who have personally treated social security claimants. The

"treating physician rule" provides that a treating source's opinion regarding the nature and

severity of a claimant's impairments that is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques" and not inconsistent with the other substantial evidence in the

record should be given controlling weight. 20 C.F.R. § 404.1527(c)(2). However, the "opinions

of a treating physician . . . need not be given controlling weight where they are contradicted by

other substantial evidence in the record." *Veino*, 312 F.3d at 588 (citations omitted). The less

consistent an opinion is with the record as a whole, the less weight it will be given. *Snell v.*

*Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

An ALJ is "free to resolve issues of credibility as to lay testimony or to choose between

properly submitted medical opinions." *McBrayer v. Sec'y of Health & Human Servs*., 712 F.2d

795, 799 (2d Cir. 1983) (quoting *Gober v. Matthews,* 574 F.2d 772, 777 (3d Cir.1978)). Yet, an

ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating

physician's opinion." *Burgess v. Astrue*, 537 F.3d 117, 131 (2d Cir. 2008) (*Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)).  For that matter, an ALJ cannot set his own expertise against that of any physician who submitted an opinion to or testified before him or her.  *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998).

If an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must "give good reasons" for doing so.  20 C.F.R. §404.1527(c)(2).  In determining what weight to give to the treating physician's opinion, the ALJ is required to apply the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating source's opinion is with the record as a whole; (5) the specialization of the source in contrast to the condition being treated; and (6) any other significant factors.  *See id.*  After considering the above factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

 Before an ALJ can weigh these factors, however, the ALJ must develop the record. *Burgess v. Astrue*, 537 F.3d at 129.  Indeed, an "ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."  *Shaw*, 221 F.3d at 131.  "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating  physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'"  *Burgess*, 537 F.3d at 129 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)).  "[W]here . . . an ALJ concludes that the opinions or reports rendered by a claimant's treating physicians lack objective clinical findings, she may not reject the opinion as unsupported by objective medical evidence without

taking affirmative steps to develop the record in this regard." *Rivas v. Barnhart*, No. 01 Civ. 3672 (RWS), 2005 WL 183139, at *23 (S.D.N.Y. Jan. 27, 2005). Moreover, "[a]n ALJ's affirmative obligation to develop the record also includes the obligation to contact a claimant's treating physicians and obtain their opinions regarding the claimant's residual functional capacity." *Tirado v. Astrue*, No. 10–CV–2482 (ARR), 2012 WL 259914, at *4 (E.D.N.Y. Jan. 25, 2012) (citing *LoRusso v. Astrue*, No. 08-CV-3467, 2010 WL 1292300, at *7 (E.D.N.Y. March 31, 2010)).

### *Plaintiff's Arguments*

In moving for judgment on the pleadings in this case, plaintiff principally argues that the ALJ failed to follow the treating physician rule and failed to develop the record. Plaintiff is correct in both respects. First, the ALJ's decision fails to even mention the "Lumbar Spine Impairment Questionnaire," which contained assessments inconsistent with the finding that plaintiff was capable of sedentary work. Specifically, this document stated that plaintiff was unable to sit or stand/walk for more than three hours during an eight-hour day, unable to lift or carry objects weighing more than 10 pounds, and only occasionally able to lift and carry objects weighing less than 10 pounds (409-14). While one or more pages, including the signature page, were missing from the copy of the questionnaire included in the Administrative Record, facts set forth in the questionnaire – such as the date of first treatment – and the fact that it was submitted by plaintiff's counsel with other documents from Dr. Kamel strongly suggests that this document was prepared by plaintiff's treating neurologist/psychologist.

The ALJ not only ignored this questionnaire altogether, but failed to mention Dr. Kamel's letter dated July 7, 2008. In that letter, Dr. Kamel stated, among other things, that plaintiff required "round-the-clock medication and frequent period of rests [*sic*]" and was

"permanently partially disabled" (408). To this end, Dr. Kamel stated that he had prescribed not only Lyrica – a prescription drug used to treat pain caused by nerve damage, *see* http://www. drugs.com/lyrica. html – but a "Duragesic patch," the brand-name version of a Fentanyl patch. During cross-examination at the hearing, Dr. Axline agreed that this patch – which the manufacturer characterizes as "strong medicine for serious pain" that "should only be used when other less potent medicines have not been effective and when pain needs to be controlled around the clock," *see* http://www.duragesic.com – as a "strong medication" (118). However, the ALJ did not discuss this letter or the implications of prescribing what her decision called "a Fentagyle [*sic*] Patch" (15). Indeed, the only letter from Dr. Kamel which the ALJ mentioned was a two-sentence note dated January 11, 2007, in which Dr. Kamel stated only that plaintiff was his patient and that he believed plaintiff to be "partially disabled without consideration of any past or present drug and/or alcohol use" (374).

The ALJ did not ignore the "Psychiatric/Psychological Impairment Questionnaire" provided by plaintiff's counsel, which stated that plaintiff would be incapable of even "low stress" jobs (406). Rather, the ALJ – after correctly noting that the signature on this questionnaire was illegible and resembled the signature of a staff psychotherapist (22) – simply assumed that this questionnaire was not written by, or at the direction of, the doctor whose name was printed below the signature line of the questionnaire (407). This assumption does not appear to be based on anything more than speculation, since there is nothing to suggest that the ALJ made any effort to obtain records from the Western Queens Consultation Center – the facility at which both the staff psychotherapist and the doctor worked.

If the ALJ was uncertain about the identity of the authors of the Lumbar Spine and Psychiatric/Psychological Impairment Questionnaires, she should have taken steps to ascertain

whether the questionnaires were authored by treating physicians and, if not, to obtain the treating physician's assessments of plaintiff's residual functional capacity. See, e.g., *Tirado*, 2012 WL 259914, at *4; *LoRusso*, 2010 WL 1292300, at *7. The ALJ not only failed to do so, but made no effort to obtain any assessment of plaintiff's residual function capacity from plaintiff's primary care physician, Dr. Santos, or to obtain any medical records for the period after 2006. Indeed, aside from the Psychiatric/Psychological Impairment Questionnaire and the Ryvkin letter, which were provided by plaintiff's counsel at the hearing, the ALJ had no records whatsoever regarding plaintiff's treatment at the Western Queens Consultation Center.

In light of the ALJ's failure to obtain the records on which the Psychiatric/Psychological Impairment Questionnaire was based, the ALJ could not have performed the analysis required under 20 C.F.R. §404.1527(c). The ALJ not only did not know the length of the treatment relationship and the frequency of examination, but mistakenly believed that plaintiff had stopped – rather than started – attending treatment at the Western Queens Consultation Center in September 2007 (14). She also did not know the nature and extent of the treatment relationship, mistakenly believing that plaintiff was receiving treatment for alcoholism (*id.*). Moreover, without the records she could not have assessed the evidence underlying the Psychiatric/ Psychological Impairment Questionnaire and the Ryvkin letter; how consistent the views expressed in those documents were with the record as a whole; or the specialization of the source of the documents in contrast to the condition being treated. Accordingly, the ALJ did not supply "good reasons" for giving little if any weight to the Psychiatric/Psychological Impairment Questionnaire, as required under 20 C.F.R. §404.1527(c)(2).

Similarly, because the ALJ had no medical records for the period after December 5, 2006, neither she nor Dr. Axline had any basis for assessing plaintiff's physical condition after

that date.  Indeed, Dr. Axline had never examined or even seen plaintiff.  Accordingly, Dr. Axline's assessment that plaintiff could sit for six hours in an eight-hour day, if he "had the opportunity to change positions," was apparently based on the fact that plaintiff had flown traveled for California to New York at some point in the past (110).  Similarly, his assessment that plaintiff could walk for two hours – rather than just two or three blocks – at the time of the hearing was apparently based on the doctor's mistaken belief that plaintiff testified that he walked five blocks without stopping in order to attend the hearing (109).   In fact, plaintiff testified that he walked four or five blocks in toto in "walking to the train station and walking from the train station" to the hearing (91-92).

Since this Court concludes that the ALJ failed to follow the "treating physician rule" or to develop the record adequately, this Court need not address the remainder of the arguments contained in the plaintiff's motion papers.   However, this Court notes that the procedure the ALJ followed with respect to the experts' testimony was deeply flawed in a way that jeopardized plaintiff's due process rights.  First, the ALJ failed to obtain the witnesses' CVs in advance, promised to adduce the experts' qualifications at the hearing but never did so fully, then failed to place the CVs in the Administrative Record.  This not only precluded plaintiff from examining the experts regarding their qualifications, but would have made it impossible for this Court to assess those qualifications.

Second, having failed to develop the medical record adequately in advance of trial, the ALJ failed to provide Dr. Axline with post-2006 medical records.  Since the hearing related to whether plaintiff was disabled during the period from January 9, 2006, to the present, this failure placed the doctor in the impossible position of having to testify regarding a one-and-one-half-year period for which he had no records whatsoever, leading him to base his testimony on his

own questionable assessment of plaintiff's credibility.  Moreover, because Dr. Axline testified telephonically, he could not even review (or be cross-examined regarding) the post-2006 records that plaintiff's counsel provided at the hearing.

Third, the post-hearing procedure designed to rectify this problem was flawed.  When the ALJ sent the post-2006 records to Dr. Axline, the ALJ wrote a letter to inform plaintiff's counsel of that fact and to inform plaintiff that he could "submit written questions" or submit a supplemental hearing request within ten days (26-27).  However, that letter – bearing the salutation, "Dear Charles E. Binder" – was addressed to Dr. Axline in Fairfield, Connecticut (26).  There is no evidence in the Administrative Record that plaintiff's counsel ever received it.  Indeed, the fact that plaintiff's counsel represents in his Memorandum of Law in Support of Plaintiff's Motion that he was never given "an opportunity to respond to Dr. Axline's assessment of this new evidence by interrogatories" (*id*. at 13), suggests that the ALJ's letter was never received by plaintiff's counsel.

With regards to plaintiff's obesity argument, this Court agrees with plaintiff that the ALJ, after finding that plaintiff's obesity was a severe impairment (17), failed to assess what impact plaintiff's obesity had on his residual functional capacity.  According to Social Security Ruling 02–1p, obesity is to be considered in determining whether a claimant has a medically determinable impairment, whether the impairment is severe and meets or equals a listed impairment, and whether an impairment prevents performance of past relevant work or other work in the national economy.  Finally, with respect to plaintiff's credibility argument, this Court encourages the ALJ to carefully review relevant hearing transcripts before assessing the plaintiff's credibility.  *See* pp. 22-23, *ante* (discussing inaccuracies in the summary of plaintiff's testimony contained in the ALJ's decision).

*CONCLUSION*

For the reasons set forth above, this Court denies the Commissioner's motion for judgment on the pleadings, and grants plaintiff's cross-motion to the extent of remanding this action to the Commissioner for further proceedings in accordance with this opinion.

**SO ORDERED.**

_____
SANDRA L. TOWNES
United States District Judge

Dated: March 30, 2012
      Brooklyn, New York